# TURLINGTON, etc. v ZAPENCKI

Case No. 86-1802

State of Florida, Division of Administrative Hearings

September 8, 1986

## APPEARANCES OF COUNSEL

**J. David Holder** for petitioner.

**Thomas W. Young III** for respondent.

## OPINION

DIANE A. GRUBBS, Hearing Officer.

## RECOMMENDED ORDER

Pursuant to notice, a hearing was held in this cause on July 16, 1986, in Dade City, Florida, before Diane A. Grubbs, a hearing officer with the Division of Administrative Hearings.

## ISSUE

Whether by showing the movies "Death Wish II", "First Blood", and "Police Academy", or portions of those movies, to respondent's fourth grade students, respondent violated Section 231.28(1)(f), *Florida Statutes, and Rule 6B-1.06(3)(a), Florida Administrative Code.*

## BACKGROUND

By Administrative Complaint dated March 10, 1986, petitioner instituted disciplinary procedures against the respondent. Respondent disputed the factual allegations set forth in the complaint and requested a formal hearing. The matter was referred to the Division of Administrative Hearings for further proceedings on May 19, 1986.

An Amended Administrative Complaint was filed June 27, 1986, which charged respondent with violating Section 231.28(1)(f), *Florida Statutes,* and Rule 6B-1.06(3)(a), *Florida Administrative Code.* The Amended Administrative Complaint alleges that during the 1983-84 school year, respondent permitted his fourth grade students to view the movie, "Death Wish II", an "R" rated movie, which contained scenes depicting physical violence and rape; that upon learning of the showing of "Death Wish II", the school principal instructed respondent that "R" rates films are not acceptable for elementary school students and that in the future, no films could be shown to respondent's students without having the specific permission of the principal; that following this incident, a new written policy was adopted for the 1984-85 school year which required teachers to obtain special permission from the principal prior to showing any video movies; that the new policy was discussed and explained to all teachers at a faculty meeting which the respondent attended.

The Amended Administrative Complaint further alleges that on June 3, 1985, the respondent permitted his fourth grade class to view the movie "Police Academy" and the first 43 minutes of the movie "First Blood"; that respondent did not first obtain special permission from the principal to show either movie; and that the movies contained scenes involving violence, nudity, profanity and implied sexual acts. Based upon the allegations of misconduct, the complaint alleges that respondent is guilty of personal conduct which seriously reduces his effectiveness as a employee of the school board and that respondent failed to

244

make a reasonable effort to protect his students from conditions harmful to learning or to health or safety.

On June 10, 1986, the parties filed a prehearing stipulation which contained the stipulated facts. Those stipulated facts are set forth at the beginning of the findings of fact in this recommended order.

At the hearing the petitioner presented the testimony of the following witnesses: Fred Renninger, former principal at Woodland Elementary School; Christine Cole, a teacher at Woodland; Barbara DeWitt, a teacher formerly at Woodland; Jeannette McClelland Lovelace, the Assistant Principal at Woodland; Randall Belcher, principal of Woodland; Lynn Green, parent of a student in respondent's class; Dr. John Long, Assistant Superintendent of Administration; and Dr. John Joyce, Director of Personnel. Petitioner's exhibits 1 through 4 were admitted into evidence, along with the late-filed deposition of Forest R. Kelly, a guidance counselor at Woodland. Respondent presented the testimony of the following witnesses: Kevin Schlieker, one of respondent's students; Lois Schlieker, Kevin's mother; Krista Wood, one of respondent's students; Earl Wood, Krista's father; Toby Meyer, one of respondent's students; Debbie Abercrombie, Toby's mother; Sharon Edge, mother of one of respondent's students; Ron Stevens, father of two of respondent's students; and the respondent. Respondent's exhibits 1 through 7 were admitted into evidence, and ruling on respondent's exhibit number 8 was reserved and is set forth in this recommended order. Petitioner presented two rebuttal witnesses.

Both parties have timely filed proposed recommended orders and a ruling on each proposed finding of fact has been made in the appendix to this recommended order.

## EVIDENTIARY RULING

At the completion of respondent's case, respondent offered into evidence excerpts of the discovery deposition of David Younglove taken on August 27, 1985. Respondent urged, among other things, that the excerpts should be admitted into evidence because Mr. Younglove was unavailable to testify at the final hearing. However, respondent failed to present evidence that Mr. Younglove was unavailable to testify, and therefore, the excerpts of Mr. Younglove's deposition are not admissible as an exception to the hearsay rule on that ground. Nevertheless, Section 120.58(1)(a), *Florida Statutes*, permits hearsay to be introduced into evidence "for the purpose of supplementing or explaining other evidence". In this case several pages of Mr. Younglove's deposition supplement and explain the respondent's testimony concerning his belief that permission had been obtained to show movies

245

at the end of the 1984-85 school year and supplement and explain respondent's testimony that he believed the movies shown were rated "P" or "PG". Therefore, pages 18, 20, 21, 23, 24, 61, 66, and 68 of Respondent's Exhibit No. 8 are admitted into evidence. As for the remaining pages, petitioner's objection to their admissibility is sustained.

## FINDINGS OF FACT

### STIPULATED FACTS:

1. Respondent holds Florida teaching certificate 367043 covering the areas of Elementary Education, English and Reading. At all times material hereto, the respondent was employed as a fourth grade teacher at Woodland Elementary School in the Pasco County School District. During the 1983-84 school year, the respondent permitted his fourth grade class to view the movie "Death Wish II", and "R" rated movie. Subsequently, the respondent's principal instructed the respondent that in the future, no films could be shown to the respondent's students without first obtaining a specific permission of the principal.

2. Following the showing of "Death Wish II", the principal adopted a new policy for the 1984-85 teacher handbook which stated, "No video movies are to be shown in the classroom without special permission from the principal." The new policy requiring special permission from the principal was discussed and explained to all teachers at a faculty meeting on or about August 20, 1984. The respondent was in attendance at the meeting.

3. On June 3, 1985, the respondent permitted his fourth grade class to view approximately forty-three minutes of the movie "First Blood" at which time he stopped the movie due to his concern over the escalating violence depicted in the movie. The respondent also permitted his fourth grade students to view the movie "Policy Academy". The respondent did not obtain special permission from his principal to show those movies to his students. The movies contained scenes involving violence, nudity, profanity and implied sexual acts.

## DEATH WISH II

4. At the end of the 1983-84 school year, the respondent's fourth grade class joined Mr. Younglove's sixth grade class to watch video movies in Mr. Younglove's classroom. The movie "Death Wish II" was shown. The movie was on a video disc that did not have a rating on it. However, Mr. Younglove had a card which contained numbers indicating when the movie would have to be stopped to edit certain parts of the movie by fast forwarding. Mr. Younglove operated the

video equipment and fast forwarded the movie at certain times. There was insufficient evidence to determine what specific portions of the movie "Death Wish II" had been edited by fast forwarding.

5. Prior to allowing his students to view the movie "Death Wish II", the respondent had not seen the movie himself and had taken no steps to personally determine the movie's rating. Further, respondent, was not familiar with the theme, plot or story line of the movie other than believing that "it had something to do with the bad guys getting it from the good guys for a change".

6. "Death Wish II" is an extremely violent movie containing graphic rape scenes, numerous scenes of cold-blooded murder committed by the movie's "hero", and vulgar language. Prior to the first rape scene, which occurs within the first ten minutes of the movie, it is apparent that the movie is not suitable for fourth graders. From the build-up to the rape scene, it is fairly obvious what is going to occur. The entire theme of the movie is inappropriate. It suggests that the criminal justice system does not work, that it is acceptable to obstruct the police in their investigation of a crime, and that it is justifiable for a victim of a crime to seek his own revenge by systemically executing the perpetrators of the crime. Mr. Kelly, the Guidance Counselor at Woodland, succinctly summarized the movie by stating, "It is totally inappropriate for showing not only nine and ten-year-olds, but I would say it's inappropriate for most human beings."

7. Subsequent to the showing of "Death Wish II", Mr. Stevens, a parent of one of respondent's students, called Mr. Renninger, the principal, about the showing of the movie. Mr. Renninger called respondent into his office and discussed the matter with him. Mr. Renninger told respondent that an "R" rated movie was not acceptable to show elementary students, and that in the future, respondent could not show any video movies to the students without first obtaining the principal's permission. Respondent talked to Mr. Stevens and was very apologetic about the showing of the movie.

TEACHER'S HANDBOOK-PAGE 42B

8. Prior to the opening of the 1984-85 school year, the teachers at Woodland Elementary School, including respondent, attended a faculty meeting at which time revisions to the teacher handbook were discussed. Page 42B, entitled "Responsibilities of Teachers - Lesson Plan", was specifically discussed. Page 42B contains the following language:

All films, filmstrips and VCRs tapes MUST be listed in your lesson plan. No video movies are to be shown in the classroom at any time without special permission from the principal.

The requirement that teachers obtain special permission from the principal prior to showing any video movie was added to the handbook as a result of the showing of "Death Wish II".

## "POLICE ACADEMY" AND "FIRST BLOOD"

9. On June 3, 1985, at the end of the 1984-85 school year, respondent's fourth grade class once again joined Mr. Younglove's sixth grade class to view video movies. It was the end of the school year, and the movies were not intended to have any educational value but were simply to entertain the students. The teachers were not required to submit lesson plans for that period of time.

10. On the Friday immediately preceding Monday, June 3, 1985, Mr. Younglove told respondent that he had obtained authorization from the assistant principal to show "P" and "PG" rated films to his classroom. Mr. Younglove had received permission slips signed by the student's parents indicating that "P" and "PG" film would be shown. The respondent also sent permission slips to the parents of his students. Respondent was advised that the movies would be brought in by the students.

11. When respondent's students arrived at Mr. Younglove's classroom, the movie "First Blood" was in progress. Mr. Younglove informed respondent that the movie had been edited for television and was "all right". However at some point thereafter, Mr. Younglove left the classroom leaving respondent to monitor the combined classes. As the movie continued, respondent became concerned by the escalating violence in the movie and therefore ordered the film stopped. The video tape was then rewound to the beginning of the tape to the movie "Police Academy". Prior to permitting his students to view "First Blood", the respondent had not seen the movie himself and was not familiar with its plot, theme or story line. Neither respondent nor Mr. Younglove had received special permission from the principal or assistant principal to show the movie "First Blood".

12. The portion of "First Blood" shown to respondent's class contained profanity and physical violence and, as admitted by respondent, was not appropriate for viewing by fourth grade students.

13. Mr. Younglove was still absent from the room when the movie "Police Academy" began. The respondent did not know the movie's rating but questioned Mr. Younglove about the rating when Mr. Younglove returned to the classroom. Mr. Younglove informed respondent that it was rated "PG". Prior to permitting his students to view the movie, respondent was not familiar with the movie's theme, plot or

248

story line, although he assumed that it was a comedy because he had seen "Police Academy II" advertised on T.V.

14. The movie "Police Academy" contains numerous profanities and vulgarities which are regularly spaced throughout the movie. The movie contains female nudity and two implied sex scenes. Although the movie was stopped and fast forwarded, apparently on two occasions when nudity had been observed, the students viewed all of "Police Academy" except for approximately two minutes and 30 seconds when it was fast forwarded and the screen was blank. As admitted by respondent, the movie "Police Academy" is not appropriate for viewing by 10-year old children. Indeed, the movie is so filled with inappropriate language and activity that it would be impossible to edit out all the objectionable material and have much of the movie left.

15. During the showing of "First Blood" and "Police Academy", there was considerable activity going on in the classroom. Students were going in and out of the classroom to get drinks of water. Several students were practicing karate, having just recently seen the movie "Karate Kid". Others were listening to music on cassette tape recorders. Some students were playing "finger break", and some students were crawling around under the tables. The noise level in the classroom was fairly loud, and many students were paying little attention to the movie.

16. On the Wednesday following the showing of the film, respondent called the mother of one of his students who had been upset about the movies being shown to her daughter. During the conversation, the parent advised respondent that the movies were "R" rated. This was the first time that respondent learned of the rating of the films.

## RESPONDENT'S CONDUCT

17. By allowing fourth grade students to view the movies, "Death Wish II", "Police Academy", and "First Blood", the respondent showed a complete lack of judgment. After the first several minutes of both "Police Academy" and "Death Wish II", it becomes quite apparent that the movies are not suitable for 9 and 10-year olds. Respondent's belief that the movies were rated "PG" does not in any way justify the respondent's behavior in permitting his class to continue to view movies that are totally inappropriate for that age group. After the incident involving "Death Wish II", respondent had been specifically told that he had to obtain permission from the principal prior to showing any video movies. He was also aware of the written policy which requires this. Nevertheless, he allowed his fourth grade class to view "Police Academy" based on Mr. Younglove's representa-

249

tion that the movie was rated "PG" and that the Assistant Principal had given permission for "PG" rated movies to be shown, neither of which representation, as it turned out, was accurate.

## RESPONDENT'S EFFECTIVENESS AS A TEACHER

18. Respondent began teaching in the Pasco County School System in the 1974-75 school year. Since that time, he has received evaluations indicating that he has been a "satisfactory" or "effective" teacher every year except for his first evaluation as a first year teacher, which indicated that he needed improvement in every area listed, and an evaluation for the period of August, 1978, to February, 1979, which indicated that his performance was unsatisfactory in three of the five categories listed. SInce the 1979 evaluation, the respondent has been evaluated as satisfactory in every school year.

19. At the hearing, the parents of several of respondent's students testified that respondent had been a good teacher for their child and that they would not hesitate to have respondent teach another one of their children even though they were aware of the content of the movies that were shown in the classroom. Letters from the parents of 19 other students who had respondent as a teacher supported the opinion of the five parents who had testified on behalf of respondent that respondent was a good teacher. Respondent has maintained a good rapport with both his students and their parents, and he has been very effective in improving some of his students' academic skills.

20. Dr. John Long, Assistant Superintendent for Administration, believes that respondent's effectiveness as a teacher has been seriously affected by his conduct, but not so seriously reduced that respondent could not have taught again in Pasco County on a probationary status at a school other than Woodland. Dr. John S. Joyce, the Director of Personnel, believes that respondent's effectiveness as a teacher had been drastically reduced as a Pasco County teacher in that respondent's action in showing inappropriate movies for a second year in a row indicates that respondent is either insubordinate or defective in judgment.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties to and the subject matter of this proceeding. Section 120.57(1), *Florida Statutes.*

The Education Practices Commission has the authority to suspend, revoke or otherwise discipline the teaching certificate of any person who "[u]pon investigation, has been found guilty of personal conduct

250

which seriously reduces his effectiveness as an employee of the School Board." Section 231.28(1)(f), *Florida Statutes*. The Education Practices Commission may suspend, revoke, or otherwise discipline the teaching certificate of any person who has "violated the provisions of law or rules of the State Board of Education, the penalty for which is the revocation of the teacher certificate." Section 231.28(1)(h), *Florida Statutes*. Rule 6B-1.06, *Florida Administrative Code*, provides in pertinent part as follows:

(1) The following disciplinary rule shall constitute the Principles of Professional Conduct for the Education Profession in Florida and shall apply to any individual holding a valid Florida teachers certificate.

(2) Violation of any of these principles shall subject the individual to revocation or suspension of the individual teaching certificate or other penalties as provided by law.

(3) Obligation to the student requires that the individual:

(a) Shall make reasonable effort to protect the student from conditions harmful to learning or to health or safety.

The Amended Administrative Complaint alleges that respondent violated Section 231.28(1)(f), *Florida Statutes, and Rule 6B-1.06(3)(a), Florida Administrative Code*, by his conduct at the end of the 1983-84 and 1984-85 school years.

The evidence in this case shows that at the end of the 1983-84 school year respondent permitted his class to view the movie "Death Wish II", which movie was totally inappropriate for viewing by fourth grade students. As a result of this incident, respondent was instructed by the principal that in the future he could not show any films to the students without first obtaining permission of the principal. A written policy was added to the teacher handbook in the 1984-1985 school year which stated that no video movies could be shown in the classroom without special permission from the principal. Nevertheless, at the end of the 1984-1985 school year, respondent did not obtain special permission from the principal to show his class any movies, and once again, respondent permitted his class to view movies that were totally inappropriate for fourth graders.

Section 231.28(1)(f), *Florida Statutes*, authorizes disciplinary action to be taken if a teacher is guilty of "personal conduct which seriously reduces his effectiveness as an employee of the school board". The evidence presented in this case establishes that respondent is guilty of conduct which seriously reduces his effectiveness as an employee of the

school board. It is not only that respondent exercised extremely poor judgment in allowing his classes to view the films in question that reduces his effectiveness as an employee, but that respondent chose to ignore the specific instructions from his principal and the administrative policy which were designed to prevent the incident which occurred at the end of the 1983-84 school year from being repeated. That respondent again showed inappropriate movies during the 1984-85 school year, after ignoring a directive that he should not show any movies without first obtaining permission from the principal, reflects such extremely poor judgment that it can only be concluded that such conduct seriously reduces respondent's effectiveness as an employee of the school board. Not only is respondent's ability to make proper judgments questionable, his willingness to comply with administrative directives is also questionable. Thus, his effectiveness as an employee has been seriously reduced by his conduct.

The complaint also charges respondent with violating Rule 6B-1.06(3)(a), *Florida Administrative Code*, which requires a teacher "to make a reasonable effort to protect students from conditions harmful to learning or to health or to safety." The respondent argues that he made what he considered to be "reasonable efforts" to protect his students because he had been assured by Mr. Younglove that permission had been obtained from the Assistant Principal to show the movie, because he had been assured by Mr. Younglove that the movies were "P" or "PG" rated; and because he stopped the movie "First Blood" after he saw the escalating violence; and because the movies "Police Academy" and "Death Wish II" were fast forwarded over several parts he considered to be inappropriate. However, when the content of "Death Wish II" and "Police Academy" is considered, it is quite clear respondent's action were not sufficient. Further, these actions cannot be considered a reasonable effort when the respondent had been specifically instructed that he must personally obtained permission from the principal before showing any movies to his fourth grade students. By failing to comply with a specific directive of his principal and the written policy outlined in the teacher's handbook, it cannot be concluded that respondent made a "reasonable effort" to protect his students from conditions harmful to learning. Respondent permitted his classes to view the movies in question even though he had not previewed the movies himself and he was unaware of the content of the movies. Further, he continued to allow his class to watch the movies even after it became apparent that the movies were inappropriate for fourth graders. It is apparent in the first several minutes of both "Police Academy" and "Death Wish II" that the movies should not be

shown to fourth grade students. When it became apparent that there was objectionable material in these movies, the only "reasonable effort" that respondent could have made was to discontinue showing the movies.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is concluded that respondent has violated Section 231.28(1)(f), *Florida Statutes*, and Rule 6B-1.06(3)(a), *Florida Administrative Code*, as alleged in the Amended Administrative Complaint. However, in considering the appropriate penalty, respondent's improper conduct should be balanced with his satisfactory performance as a teacher over the last six years and the positive effect he has had on many of his students. It is, therefore,

RECOMMENDED:

That a final order be entered finding that respondent has violated Section 231.28(1)(f), *Florida Statutes*, and Rule 6B-1.06(3)(a), *Florida Administrative Code*, and suspending respondent's certificate for one (1) year.

DONE and ENTERED this 8th day of September, 1986, in Tallahassee, Florida.